Slip Op. 22-26

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SGS SPORTS INC., | Before: Jennifer Choe-Groves, Judge |
| **Plaintiff,** | Court No. 18-00128 |
| v. |  |
| UNITED STATES, |  |
| **Defendant.** |  |

## <u>OPINION AND ORDER</u>

[After a bench trial, holding that the Warehousing Agreement is a lease or similar use agreement and a Phase Two bench trial shall proceed to determine whether the subject merchandise is eligible for duty-free treatment under subheading 9801.00.20 of the Harmonized Tariff Schedule of the United States.]

Dated: March 21, 2022

<u>John M. Peterson</u> and <u>Patrick B. Klein</u>, Neville Peterson, LLP, of New York, N.Y., argued for Plaintiff SGS Sports Inc. With them on the supplemental briefs was <u>Richard F. O'Neill</u>.

<u>Monica P. Triana</u>, Trial Attorney, International Trade Field Office, and <u>Edward F. Kenny</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States. With them on the pretrial brief were <u>John V. Coghlan</u>, Deputy Assistant Attorney General of the Federal Programs Branch, <u>Jeanne E. Davidson</u>, Director, and <u>Justin R. Miller</u>, Attorney-in-Charge, International Trade Field Office, and with them on the supplemental brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Justin R. Miller</u>, Attorney-in-Charge. Of counsel on the trial and supplemental briefs was <u>Sheryl A. French</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, N.Y.

Choe-Groves, Judge:  Plaintiff SGS Sports Inc. ("Plaintiff" or "SGS") brings

this action to contest the denial of its administrative protests by U.S. Customs and

Border Protection ("Customs") regarding swimwear and related accessories that

Plaintiff entered into the United States in 2013 and 2014 ("subject merchandise").

The Court conducted a bench trial via videoconference to determine whether the

subject merchandise was entitled to duty-free treatment under subheading

9801.00.20 of the Harmonized Tariff Schedule of the United States ("HTSUS"),

which states:

> 9801.00.20.00        Articles, previously imported, with respect to which
> the duty was paid upon such previous importation . . . , if (1) reimported,
> without having been advanced in value or improved in condition by any
> process of manufacture or other means while abroad, after having been
> exported under lease or similar use agreements, and (2) reimported by
> or for the account of the person who imported it into, and exported it
> from, the United States.

HTSUS subheading 9801.00.20.[1]  The bench trial focused on the issue of whether

the Warehousing Agreement between SGS and 147483 Canada Inc. ("Canada

147483") constituted a lease or similar use agreement under HTSUS subheading

9801.00.20.  Based on the following findings of fact and conclusions of law, the

---

[1] Plaintiff stopped entering merchandise under HTSUS subheading 9801.00.20 in
2015 and now enters merchandise under HTSUS subheading 9801.00.10,Trial Tr.,
Day 1, at 80, ECF No. 83, which was amended in 2016 to include "any other
products when returned within 3 years after having been exported," HTSUS
subheading 9801.00.10.  HTSUS subheading 9801.00.10 was amended after the
subject merchandise was entered in 2013 and 2014.

Court concludes that the Warehousing Agreement is a lease or similar use agreement under HTSUS subheading 9801.00.20.

## PROCEDURAL HISTORY

Plaintiff attempted to enter the subject merchandise pursuant to HTSUS subheading 9801.00.20.  Final Pretrial Order (Phase One of Remote Bench Trial), Schedule C (Phase One Uncontested Facts) ¶ 59, ECF No. 74.  Customs denied Plaintiff's claim for duty-free treatment under HTSUS subheading 9801.00.20, reclassified the subject merchandise, and liquidated the entries.  See id., Schedule D-1 (SGS Sports, Inc. Claims and Defenses) ¶ 2, Schedule D-2 (Def.'s Claims and Defenses) ¶¶ 2–3.  Thereafter, SGS filed three timely protests challenging Customs' classification determination.  See id. Schedule B ¶ 1; Compl. ¶ 5, ECF No. 6.  When denying SGS' protests, Customs stated its determination that the subject merchandise had not been properly exported under a lease or similar use agreement as required under the duty-free HTSUS subheading 9801.00.20 because "no bailment occurred."  HQ H216475 (Jan. 16, 2015); HQ H276403 (Dec. 12, 2017).  SGS filed suit challenging the denial of its protests.  Summons, ECF No. 1; Compl.

The Parties filed cross-motions for summary judgment.  Pl.'s Mot. Summ. J., ECF No. 26; Mem. P. & A. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Summ. J. Br."), ECF No. 26-2; Def.'s Cross-Mot. Summ. J., ECF No. 30.  The Court denied

Plaintiff's motion for summary judgment and granted the cross-motion for summary judgment filed by Defendant United States ("Defendant").  SGS Sports[] Inc. v. United States, 44 CIT __, 463 F. Supp. 3d 1356 (2020).  In an order granting Plaintiff's Motion for Rehearing, ECF No. 41, the Court set aside its previous opinion and judgment, and scheduled the matter for trial.  SGS Sports Inc. v. United States, 44 CIT __, Slip Op. 20-150 (Oct. 22, 2020).

The Court granted a motion to bifurcate the trial into Phase One and Phase Two.  Am. Order ("Am. Bifurcation Order") at 1, ECF No. 66.  The Court ordered that the Phase One trial would resolve the sole issue of whether the Warehousing Agreement between SGS and Canada 147483, dated September 1, 2005, is a lease or similar use agreement.  Id.  If Phase One did not resolve the case in its entirety, Phase Two would encompass the remaining issues necessary to resolve the case. Id.  The Court stayed the remaining issues reflected in Defendant's Motion in Limine, ECF No. 52; Plaintiff's Motion in Limine to Allow Introduction at Trial of an Evidence Summary Pursuant to FRE 1006 ("Plaintiff's Motion in Limine"), ECF No. 54; and the deadline for Defendant to respond to Plaintiff's Motion in Limine, pending the Court's decision in Phase One.  Am. Bifurcation Order at 1–2. The Parties filed pretrial briefs and schedules.  Def.'s Pretrial Br., ECF No. 67; Pl.'s Pretrial Mem. ("Pl.'s Pretrial Br."), ECF No. 68; [Proposed] Pretrial Order, ECF No. 71.

The Court conducted the Phase One trial on February 4 and 5, 2021.  Docket

Entries, ECF Nos. 81, 82.  The Court heard testimony via videoconference from

three fact witnesses: Anna Murdaca, Vice President of Finance and Chief Financial

Officer of SGS since 1997 and part owner of SGS since 2007; Michael Couchman,

Warehouse Manager of Canada 147483 for approximately ten years; and Steven

Gellis, President of SGS since its incorporation in 1988 and President of Canada

147483 since its incorporation in 1985.  Trial Tr., Day 1, at 59–298, ECF No. 83.

The witnesses provided testimony that appeared to be truthful based on each

witness' respective demeanor, inflection, length of employment in his or her

position, and familiarity with the subject matter of the questions asked, and thus

provided the Court with the necessary basis to conclude that they were credible

witnesses.

In its pretrial brief, Plaintiff repeated its argument from its summary

judgment response brief that Customs was bound by its previous rulings to treat the

Warehousing Agreement as a similar use agreement under HTSUS subheading

9801.00.20 because Customs had not modified or revoked its previous rulings

under the 19 U.S.C. § 1625(c) notice and comment procedure.  Pl.'s Mem. P. & A.

Opp'n Def.'s Cross-Mot. Summ. J. and Reply Supp. Pl.'s Mot. Summ. J. at 9–15,

ECF No. 32; Pl.'s Pretrial Br. at 7–13.  Defendant objected to the 19 U.S.C.

§ 1625(c) argument at the January 21, 2020 pretrial conference and renewed its

objection at trial.  Trial Tr., Day 1, at 6–8, 27; Trial Tr., Day 2, at 340; Docket

Entry (Jan. 21, 2021 Pretrial Conference), ECF No. 72.  The Court ordered

supplemental briefing and held oral argument on the 19 U.S.C. § 1625(c) issue on

January 12, 2022.  Order (Oct. 8, 2021), ECF No. 85; Pl.'s Suppl. Br. Concerning

19 U.S.C. § 1625(c) ("Pl.'s Suppl. Br."), ECF No. 86; Def.'s Suppl. Submission

("Def.'s Suppl. Br."), ECF No. 89; Pl.'s Reply Br. Concerning 19 U.S.C. § 1625(c)

("Pl.'s Reply Br."), ECF No. 90; Docket Entry (Jan. 12, 2022 Oral Arg.), ECF No.

94; Oral Arg. (on file with the U.S. Court of International Trade).

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  The Court

reviews classification cases based on the record made before the Court.  28 U.S.C.

§ 2640(a).

A two-step process guides the Court in determining the correct classification

of merchandise.  First, the Court ascertains the proper meaning of the terms in the

tariff provision.  See Schlumberger Tech. Corp. v. United States, 845 F.3d 1158,

1162 (Fed. Cir. 2017) (citing Sigma-Tau HealthScience, Inc. v. United States, 838

F.3d 1272, 1276 (Fed. Cir. 2016)).  Second, the Court determines whether the

subject merchandise falls within the parameters of the tariff provision.  See id.

(citing Sigma-Tau HealthScience, Inc., 838 F.3d at 1276).  The former is a

question of law and the latter is a question of fact.  See id.  "[W]hen there is no

dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'" Link Snacks, Inc. v. United States, 742 F.3d 962, 965–66 (Fed. Cir. 2014) (quoting Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

The Court reviews classification cases de novo. See 28 U.S.C. § 2640(a)(1). The Court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citation omitted). The Court must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative." Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).

## FINDINGS OF FACT

The Court makes the following findings of fact based on a review of the documents admitted into evidence and the credible testimony of the witnesses during the bench trial:

1.    SGS is and has always been an importer and distributor of swimwear, sports apparel, and related merchandise. Schedule C ¶ 7; Trial Tr., Day 1, at 63, 117.

2.    SGS is a Canadian corporation that was incorporated under the Canada Business Corporations Act on January 19, 1988 by Mr. Gellis.

Schedule C ¶ 5; Pl.'s Ex. 1; Def.'s Ex. 1; Trial Tr., Day 1, at 63–64, 116.

3.   From incorporation of SGS in 1988 until 2007, Mr. Gellis was the sole owner and sole officer of SGS.  Schedule C ¶¶ 8–9; Trial Tr., Day 1, at 117.

4.   Mr. Gellis is and has always been the President of SGS.  Schedule C ¶¶ 9, 101; Trial Tr., Day 1, at 102, 272, 287–88.

5.   SGS modified its ownership structure and reorganized the shares of the company in 2007 and 2013, both of which occurred subsequent to the execution of the Warehousing Agreement.  Schedule C ¶ 91; Trial Tr., Day 1, at 201–03.

6.   Canada 147483 is a Canadian corporation that was incorporated under the Canada Business Corporations Act on October 22, 1985 at the direction of Mr. Gellis.  Schedule C ¶¶ 1– 2; Pl.'s Ex. 2; Def.'s Ex. 2; Trial Tr., Day 1, at 72, 114.

7.   From incorporation of Canada 147483 in 1985, Mr. Gellis is and has always been the sole owner and officer of Canada 147483.  Schedule C ¶¶ 3, 101; Trial Tr., Day 1, at 115.

8.   Beginning in 2001, SGS leased real property located at 6400 Cote de Liesse Road, St-Laurent, Quebec, which has continuously been the

address of SGS' office.  Schedule C ¶ 25; Pl.'s Ex. 10; Def.'s Ex. 14; Trial Tr., Day 1, at 69, 118–20.

9.    In 2005, SGS leased additional real property adjacent to 6400 Cote de Liesse Road, with an address of 6450 Cote de Liesse Road, St-Laurent, Quebec, which has continuously been the location of the warehouse since 2005.  Schedule C ¶ 26; Pl.'s Ex. 10; Def.'s Exs. 14, 16; Trial Tr., Day 1, at 69–70, 98, 118–20.

10.   Canada 147483 does not pay any rent to SGS or any other entity for use of the warehouse.  Schedule C ¶ 67; Trial Tr., Day 1, at 175.

11.   All of the property, inventory, and equipment in the warehouse are owned by SGS and were identified as assets of SGS on its financial statements.  Schedule C ¶ 68; Trial Tr., Day 1, at 176; see Def.'s Exs. 6–10.

12.   The utility bill for the real property located at 6450 Cote de Liesse Road, which is separate from the utility bill for the real property located at 6400 Cote de Liesse Road, is paid by SGS.  Schedule C ¶ 70; Trial Tr., Day 1, at 177.

13.   The insurance policy on all of the merchandise and equipment in the entirety of the real property located at 6400 and 6450 Cote de Liesse Road is held by SGS.  Schedule C ¶ 71; Trial Tr., Day 1, at 176–77.

14.     On September 1, 2005, Mr. Gellis reviewed, approved, and executed a
        document entitled "Warehousing Agreement" by signing on behalf of
        both SGS and Canada 147483 in his capacity as President and sole
        officer of both companies.  Schedule C ¶¶ 40, 45, 57; Pl.'s Ex. 8
        ("Warehousing Agreement"); Def.'s Ex. 12 ("Warehousing
        Agreement"); Trial Tr., Day 1, at 160, 295–96.

15.     Mr. Gellis was not required, according to the bylaws of either
        company, to obtain approval from any other person in order to execute
        the Warehousing Agreement.  Schedule C ¶ 44.

16.     In the Warehousing Agreement, SGS and Canada 147483 mutually
        agreed that:

        (1) "[SGS] may, from time to time request that [Canada 147483] take
        delivery of merchandise on behalf of [SGS] and to hold said
        merchandise pending the instructions of [SGS] regarding the
        disposition of the merchandise."

        (2) "[Canada 147483] agrees that in taking delivery of said
        merchandise it will perform the following functions:

                (a) provide all necessary labor for the handling, storage and safe
                keeping of the property deposited for storage;

                (b) assist [SGS] and its agents in the transportation of the

merchandise both to and from the warehouse;

(c) create and maintain inventory records of all merchandise

delivered to [Canada 147483];

(d) maintain perpetual inventory records;

(e) assist [SGS] in the issuance of samples from the inventory

on deposit;

(f) take periodic inventory of the merchandise deposited;

(g) provide, at [SGS'] request, all of the services typically

provided by a Warehouseman in the ordinary course of

business, including, but not limited to, 'pick & pack' services."

Warehousing Agreement at 1–2; see Schedule C ¶ 41; Trial Tr., Day

1, at 254.

17.    SGS does not manufacture the merchandise it sells; the merchandise is

imported from foreign suppliers, who are primarily located in China.

Schedule C ¶ 27; Trial Tr., Day 1, at 66.

18.    Beginning in 2005, SGS' foreign suppliers shipped SGS'

merchandise, by sea or by air, to Canada.  When sent by combined

transport utilizing sea and rail, the goods were transported "through

Montreal," and when sent by air, the airport of destination was

Montreal.  From Montreal, the merchandise was then transported by

truck, in bond, to Champlain, New York.  Order (Feb. 2, 2021) at 1,
ECF No. 80 (granting the Parties' joint motion to amend Schedule C
¶ 33); Trial Tr., Day 1, at 67, 127, 130–36.

19.    When the in-bond merchandise was brought into New York, SGS
would file a consumption entry in the United States and duties were
assessed on the price "paid or payable" to the foreign supplier.  Order
(Feb. 2, 2021) at 1; Trial Tr., Day 1, at 67–68, 128, 136–37.

20.    Beginning in 2005 and up until at least the date the subject
merchandise entered the United States, containers that were imported
into the United States by SGS from its foreign suppliers were
immediately exported, unaltered, from the United States to SGS'
warehouse at 6450 Cote de Liesse Road in Canada by truck.  Schedule
C ¶¶ 26, 34; Trial Tr., Day 1, at 63, 67, 128.

21.    As to the transactions from the United States to Canada, SGS acts as
both the exporter (from the United States) and importer (into Canada).
Schedule C ¶ 34; Trial Tr., Day 1, at 137, 139.

22.    The physical handling of the merchandise by Canada 147483 began
when the merchandise arrived at the loading dock for the SGS
warehouse.  Legal title to that merchandise did not pass from SGS to
Canada 147483.  Order (Feb. 2, 2021) at 2 (granting the Parties' joint

motion to amend Schedule C ¶ 62); Trial Tr., Day 1, at 63, 67, 140, 163–64, 252.

23.     When merchandise reached the SGS warehouse, Canada 147483 employees confirmed the number of cartons in the shipment; documented any open or broken boxes and notified SGS; segregated the merchandise by style, color, and size; and placed the merchandise in appropriate areas.  Trial Tr., Day 1, at 67, 74, 217, 252, 254–57.

24.     When a customer placed an order, SGS entered the order into its system.  The allocation system compared the order to the inventory on hand and automatically allocated inventory to the orders.  The SGS allocation manager reviewed the allocation and an SGS employee printed a picking ticket and placed it in a basket in the SGS front office.  Schedule C ¶¶ 64–65; Trial Tr., Day 1, at 91–92; see Pl.'s Ex. 14.

25.     Two or three times per day, a Canada 147483 employee entered the SGS front office, retrieved the accumulated pick tickets, and took the pick tickets to Mr. Couchman.  Schedule C ¶¶ 65–66; Trial Tr., Day 1, at 92–94, 235, 258–59; see Pl.'s Ex. 14; Def.'s Ex. 32.

26.     Mr. Couchman placed the pick tickets in order of priority.  Trial Tr., Day 1, at 258–60.

27.    A Canada 147483 employee retrieved the inventory by style and color

as indicated on the pick ticket, packed the merchandise, and arranged

for the carrier to ship the merchandise to the customer.  Schedule C

¶¶ 65–66; Trial Tr., Day 1, at 92–94, 235, 258–59; <u>see</u> Pl.'s Ex. 14;

Def.'s Ex. 32.

28.    The Warehouse Manager for Canada 147483, Mr. Couchman,

interacted with SGS' suppliers—both warehouse supply companies

and transport companies, such as FedEx and UPS—on behalf of SGS,

identifying himself as Warehouse Manager for SGS.  Mr. Couchman

was an authorized user on the SGS purchasing accounts for many

such vendors.  Schedule C ¶ 75; Trial Tr., Day 1, at 180–82, 246–48.

29.    A Canada 147483 employee indicated by circling that all the

inventory on a pick ticket had been picked and returned the fulfilled

pick tickets back to the SGS front office.  The fulfilled pick tickets

were used to invoice SGS for Canada 147483's services.  Schedule C

¶ 66; Trial Tr., Day 1, at 94–99, 109–10; <u>see</u> Pl.'s Ex. 12; Def.'s Exs.

16, 18, 39.

30.    Canada 147483 on its own could not decide to direct any merchandise

to leave the SGS warehouse.  No merchandise left the SGS warehouse

except according to a pick ticket from SGS.  Trial Tr., Day 1, at 263.

31.    Canada 147483 employees did not "use" merchandise for any purpose
       other than to provide "pick and pack" services.  Trial Tr., Day 1, at
       264–65.

32.    In 2013 and 2014, SGS imported the subject merchandise into the
       United States under various consumption entries and paid duties on
       the price paid or payable to the foreign supplier.  See Compl. ¶ 8;
       Order (Feb. 2, 2021) at 1; Trial Tr., Day 1, at 67–68, 128, 136–37.

33.    SGS exported the subject merchandise immediately to Canada.  See
       Compl. ¶ 9; Schedule C ¶¶ 34–35; Trial Tr., Day 1, at 63, 67, 128.

34.    SGS and Canada 147483 understood the terms of the Warehousing
       Agreement to apply to Canada 147483's handling of the subject
       merchandise.  See Trial Tr., Day 1, at 79, 241.

35.    Canada 147483 handled the subject merchandise at the warehouse in
       the same manner in which it generally handled all of SGS'
       merchandise.  See Order (Feb. 2, 2021) at 2; Schedule C ¶¶ 64–66, 75;
       Trial Tr., Day 1, at 67, 74, 91–94, 217, 235, 252–60, 264–65; see Pl.'s
       Ex. 14; Def.'s Ex. 32.

36.    SGS imported the subject merchandise into the United States,
       asserting that the merchandise was properly classified under HTSUS
       subheading 9801.00.20.  Schedule C ¶ 59.

37.   Customs denied SGS' claim for duty-free treatment under HTSUS

subheading 9801.00.20, liquidated the subject entries, reclassified the

merchandise under HTSUS Chapters 61 through 63, and assessed

duties.  Compl. ¶ 24; Trial Tr., Day 1, at 100; see Pl.'s Ex. 16.

## CONCLUSIONS OF LAW

**I.    HTSUS Subheading 9801.00.20**

The Court conducts de novo review of whether the subject merchandise

qualifies for duty-free treatment under HTSUS subheading 9801.00.20.  The Court

specifically addresses only the Phase One bifurcated trial issue of whether the

Warehouse Agreement is a lease or similar use agreement.

### A.    Legal Framework

In construing the terms of the HTSUS headings, "[a] court may rely upon its

own understanding of the terms used and may consult lexicographic and scientific

authorities, dictionaries, and other reliable information sources."  Carl Zeiss, Inc. v.

United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing Baxter Healthcare

Corp. v. United States, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999)).  Ordinarily, the

Court may also consult the Harmonized Commodity Description and Coding

System's Explanatory Notes ("Explanatory Notes"), which "are not legally binding

or dispositive," Kahrs Int'l, Inc. v. United States, 713 F.3d 640, 645 (Fed. Cir.

2013), but here the tool is unavailable because Chapter 98 does not have

Explanatory Notes.  Tariff terms are defined according to the language of the

headings, the relevant section and chapter notes, the Explanatory Notes, available

lexicographic sources, and other reliable sources of information.

### B.    Analysis of the Terms of HTSUS Subheading 9801.00.20

The Court first ascertains the proper meaning and scope of HTSUS

subheading 9801.00.20.  See Bausch & Lomb, Inc. v. United States, 148 F.3d

1363, 1365 (Fed. Cir. 1998).

HTSUS subheading 9801.00.20 covers reimported merchandise: (1) upon

which duty was paid at the time of previous importation; (2) that has not been

advanced in value or improved in condition by any process of manufacture or other

means while abroad; (3) that was exported under a lease or similar use agreement;

and (4) that is reimported by or for the account of the person who imported the

merchandise into, and exported it from, the United States.  See HTSUS subheading

9801.00.20; Skaraborg Invest USA, Inc. v. United States, 22 CIT 413, 417, 9 F.

Supp. 2d 706, 709 (1998).

Generally, an importer must pay a duty on previously imported merchandise

that was exported and then reimported into the United States.  19 C.F.R. § 141.2.

HTSUS subheading 9801.00.20 provides an exception to this general rule by

allowing duty-free treatment if the subject merchandise was originally imported

into the United States and duties were paid, the merchandise was exported outside

the United States under a lease or similar use agreement, and then reimported back

into the United States.  The purpose of this provision is to prevent the imposition

of double duties for merchandise that meets the specific requirements of HTSUS

subheading 9801.00.20.  Customs determines whether to allow for duty-free

treatment under HTSUS subheading 9801.00.20, as set forth in the relevant

implementing regulation as follows:

> **Entry of reimported articles exported under lease.**
> Free entry shall be accorded under subheading 9801.00.20,
> Harmonized Tariff Schedule of the United States (HTSUS), whenever
> it is established to the satisfaction of the Center director that the article
> for which free entry is claimed was duty paid on a previous importation
> . . . , is being reimported without having been advanced in value or
> improved in condition by any process of manufacture or other means,
> was exported from the United States under a lease or similar use
> agreement, and is being reimported by or for the account of the person
> who imported it into, and exported it from, the United States.

19 C.F.R. § 10.108.

## C.    Lease or Similar Use Agreement

Phase One of this bifurcated trial involves only the third element, whether

the Warehousing Agreement constitutes a lease or similar use agreement.  Am.

Bifurcation Order at 1; see HTSUS subheading 9801.00.20.  Plaintiff argues that

its Warehousing Agreement is a bailment agreement, which Customs has

previously recognized as a "lease or similar use agreement[]."  See Pl.'s Pretrial

Br. at 3; Trial Tr., Day 2, at 330, 338–39.  The Court notes at the outset that

Plaintiff's characterization of its arrangement with Canada 147483 as a "bailment agreement" presupposes a legal conclusion, and the Court does not entertain an analysis of whether there is a bailment agreement in this case.  The Court confines its analysis to whether the facts ascertained at trial establish a lease or similar use agreement under a statutory analysis of HTSUS subheading 9801.00.20.

The Court looks to dictionary definitions to construe the tariff terms "lease or similar use agreement[]."  "Lease" is defined as "[a] contract by which a rightful possessor of personal property conveys the right to use that property in exchange for consideration."  Lease (5), Black's Law Dictionary (11th ed. 2019).  "Similar" is defined as "alike in substance or essentials."  Similar, Merriam-Webster's Collegiate Dictionary at 1161 (11th ed. 2020).  "Use" as a noun is defined as "[t]he application or employment of something."  Use (noun) (1), Black's Law Dictionary (11th ed. 2019).  "Use" as a verb is defined as "[t]o employ for the accomplishment of a purpose."  Use (verb) (1), Black's Law Dictionary (11th ed. 2019).  "Use" is also defined as "to carry out a purpose or action."  Use, Merriam-Webster's Collegiate Dictionary at 1378.  "Agreement" is defined as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  Agreement (1), Black's Law Dictionary (11th ed. 2019).

Accordingly, the Court construes the terms "lease or similar use

agreement[]" under HTSUS subheading 9801.00.20 in light of these relevant dictionary definitions as follows:

The Court construes the term "lease" to mean a contract by which a rightful possessor of the subject merchandise conveys the right to employ the subject merchandise for the accomplishment of a purpose or action in exchange for consideration.

The Court construes the terms "similar use agreement" and "use agreement similar to a lease" to be synonymous in the context of HTSUS subheading 9801.00.20, because "similar" compares the use agreement to a lease.

The Court construes the synonymous terms "similar use agreement" and "use agreement similar to a lease" to mean a mutual understanding between two or more parties to employ the subject merchandise for the accomplishment of a purpose or action that is alike in substance to a lease. Both a lease and a similar use agreement require that the subject merchandise be employed for the accomplishment of a purpose or action.

Few cases at the U.S. Court of International Trade have opined on a lease or similar use agreement. In Werner & Pfleiderer Corp. v. United States ("Werner"), 17 CIT 916 (1993), the court held that consideration is not required for a valid similar use agreement. 17 CIT at 918. The Court of International Trade defined a "similar use agreement" under HTSUS subheading 9801.00.20 as a loan for

temporary use.  Skaraborg, 22 CIT at 418; Werner, 17 CIT at 918.  In Werner, the

subject merchandise machine was reimported to the United States after it was

loaned by the plaintiff to Ogilvie Mills Limited and several test runs of the subject

merchandise machine were performed at Ogilvie Mills Limited's facilities in

Canada.  17 CIT at 916.  The Werner court determined that the agreement to

"loan" the machine "for testing purposes" was "either a lease or a similar use

agreement."  Id. at 918–19.  This is consistent with the Court's definition of a

similar use agreement because testing requires operating the subject merchandise

for the accomplishment of a purpose or action.

Legislative history also supports the Court's statutory interpretation.  In the

1963 version of the Tariff Schedule of the United States ("TSUS"), which followed

the enactment of the Tariff Classification Act of 1962, Pub. L. No. 87-456, Item

801.00 of the TSUS appeared as follows:

> Articles, previously imported, with respect to which the duty was paid
> upon such previous importation, if (1) reimported, without having been
> advanced in value or improved in condition by any process of
> manufacture or other means while abroad, after having been exported
> under *lease to a foreign manufacturer*, and (2) reimported by or for the
> account of the person who imported it into, and exported it from, the
> United States.

Tariff Classification Act of 1962, Pub. L. No. 87-456, Schedule 8, Item 801.00,

77A Stat. 403, 406 (1962) (emphasis added).  Item 801.00 of the TSUS was

amended by the Trade and Tariff Act of 1984, Pub. L. No. 98-573, to language

identical to the language of HTSUS subheading 9801.00.20, as follows:

### SEC. 118.  REIMPORTATION OF CERTAIN ARTICLES ORIGINALLY IMPORTED DUTY FREE.

Item 801.00 is amended—

. . .

(2)     by striking out "lease to a foreign manufacturer" in clause (1) and inserting in lieu thereof "*lease or similar use agreements*."

Trade and Tariff Act of 1984, Pub. L. 98-573, § 118, 98 Stat. 2948, 2953–54

(1984) (emphasis added).  The legislative intent is recorded in a Ways and Means

Committee Report of stand-alone bill H.R. 5448, as the amendment was originally

introduced, and later a House of Representatives Report of the amendment as

combined with other bills in omnibus bill H.R. 6064:

> Section 1 of H.R. 5448, if enacted, would extend the duty-free treatment of item 801.00 of the Tariff Schedules of the United States (TSUS) to the reimportation of articles which were imported into the United States and then exported *under lease or similar use agreement* to an entity other than a foreign manufacturer. . . .  The intent of this legislation is to extend the coverage of that provision to the reimportation of goods which were exported *under lease* to someone other than a foreign manufacturer; of particular concern are exportations *under lease* to a government or service industry. . . .

> Item 801.00 may be applied to any type of article.  However, it appears to be primarily applied to the reimportation of injection molds for plastic or rubber products, such as combs, plastic houseware items, toys, or tires.  The molds are manufactured of steel and generally range in price from $8,000 to $80,000.  Other reimported articles entered

> under item 801.00 include dies of all kinds and general tooling
> equipment such as jigs, fixtures, and CNC machine lathes. . . .

Report on Miscellaneous Tariff and Customs Bills Before the Subcomm. on Trade

of the H. Comm. on Ways and Means, 98th Cong. 34, 157–59 (1984) (emphasis

added); see also H.R. Rep. No. 98-1015, at 1, 24 (1984), reprinted in 1984

U.S.C.C.A.N. 4960, 4983.  The word "lease" in Item 801.00 was replaced with the

phrase "lease or similar use agreement," but the legislative history reflects a focus

on lease with references to "goods which were exported under lease" and

"exportations under lease."  A reading of the entire report supports a conclusion

that the expansion of the provision intended by the 1984 amendment does not

apply to all goods that were imported and duty-paid, then exported and reimported,

under any type of agreement that might be described as a use agreement, but rather

a use agreement that is similar to a lease.

Based on credible testimony presented during a bench trial, the Court finds

that under the Warehousing Agreement in this case, SGS and Canada 147483

expressed a mutual understanding for Canada 147483 to "take delivery of

merchandise on behalf of [SGS] and to hold said merchandise pending the

instructions of [SGS] regarding the disposition of the merchandise;" "provide all

necessary labor for the handling, storage and safe keeping of the property

deposited for storage;" "assist [SGS] and its agents in the transportation of the

merchandise both to and from the warehouse;" "create and maintain inventory records of all merchandise delivered to [Canada 147483]; "maintain perpetual inventory records;" "assist [SGS] in the issuance of samples from the inventory on deposit;" "take periodic inventory of the merchandise deposited;" and "provide, at [SGS'] request, all of the services typically provided by a Warehouseman in the ordinary course of business, including, but not limited to, 'pick & pack' services." Warehousing Agreement at 1–2.  Evidence elicited at trial established that Canada 147483's handling of the subject merchandise involved confirming the number of cartons in the shipment; notifying SGS of any open or damaged boxes; segregating by style, color, and size; placing the merchandise in appropriate areas; retrieving the inventory by style and color as indicated on the pick ticket; packing the merchandise; and arranging for a carrier to ship the merchandise to the customer. Schedule C ¶¶ 65–66; Trial Tr., Day 1, at 91–94,  217, 235, 252–55, 257–59; see Pl.'s Ex. 14.  The Court finds that sufficient credible evidence was presented at trial to establish that Canada 147483 employees, pursuant to the Warehousing Agreement, used the subject merchandise for the accomplishment of the purpose or action of providing warehousing and "pick and pack" services that satisfies the meaning of a similar use agreement under HTSUS subheading 9801.00.20.

Defendant argues that by its plain or common meaning, a "use agreement similar to a lease" conveys the right to use and possess the property, and that

possession is characterized by dominion and control over the property. Def.'s

Pretrial Br. at 21; Trial Tr., Day 2, at 345–47. Defendant contends that because the

services covered by the Warehousing Agreement do not involve use of

merchandise, and Canada 147483 did not have exclusive possession, control, or

dominion over the subject merchandise and could not use the subject merchandise

as it wished, the Warehousing Agreement is not a use agreement similar to a lease.

Def.'s Pretrial Br. at 21–26; Trial Tr., Day 2, at 347–52.

The Court does not agree with Defendant that the "use" must be for the

specific purpose for which the subject merchandise was designed (for example,

Canada 147483 employees do not need to wear the bathing suits for swimming

under the "use" requirement), but it is sufficient if some purpose or action, such as

performing warehousing services or "pick and pack" services, or testing as in

Werner, is the purpose or action under the agreement.

Defendant proposed including an element of possession by defining "lease"

as "a contract by which one owning property grants to another the right to possess,

use and enjoy it for a specified period of time in exchange for periodic payments."

Def.'s Pretrial Br. at 18–19 (quoting Black's Law Dictionary at 800 (5th ed. 1979))

(emphasis and internal punctation omitted). Defendant proposed defining

"possession" as:

1. The fact of having or holding property in one's power; the exercise

> of dominion over property.  2. The right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object.  3. Civil law.  The detention or use of a physical thing with the intent to hold it as one's own.  La. Civ. Code art. 3421(a).  4. (usu. pl.) Something that a person owns or controls. . . .

Id. at 10 n.2 & 18–19 (quoting Black's Law Dictionary (11th ed. 2019)).

The Court rejects Defendant's contention that use under HTSUS subheading 9801.00.20 must involve Canada 147483 possessing or having exclusive control over the subject merchandise, akin to temporary ownership of the goods.  The Court declines to read "use" as narrowly as proposed by Defendant.

In sum, the Court concludes based on the credible evidence presented at trial that the Warehousing Agreement is a lease or similar use agreement, specifically a mutual understanding between two or more parties to employ the subject merchandise for the accomplishment of the purpose or action of providing warehousing and "pick and pack" services that is alike in substance to a lease. Therefore, the Court holds that the Warehousing Agreement is a lease or similar use agreement for purposes of HTSUS subheading 9801.00.20.  Because the third requirement of HTSUS subheading 9801.00.20 is satisfied, the Court concludes

that a further trial on Phase Two of the Bifurcation Order shall proceed.[2]

## CONCLUSION

For the foregoing reasons, the Court holds that the Warehousing Agreement is a lease or similar use agreement and a trial should proceed under Phase Two of the Bifurcation Order to determine whether Plaintiff's subject entries qualify for duty-free treatment under HTSUS subheading 9801.00.20.

It is hereby

**ORDERED** that following a bench trial, the Court concludes that the Warehousing Agreement is a lease or similar use agreement under Phase One of the Bifurcation Order; and it is further

**ORDERED** that a trial should proceed under Phase Two of the Bifurcation Order to determine whether Plaintiff's subject entries qualify for duty-free treatment under HTSUS subheading 9801.00.20; and it is further

**ORDERED** that a status conference will be scheduled accordingly.

  /s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    March 21, 2022
          New York, New York

---

[2] The Court considered supplemental briefing and held oral argument on the issue of whether 19 U.S.C. § 1625(c) applies in this case.  In light of the Court's holding that the Warehousing Agreement is a lease or similar use agreement for purposes of HTSUS subheading 9801.00.20, the Court need not address the 19 U.S.C. § 1625(c) arguments presented by the Parties.